## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| MARIO ORTIZ, STEPHEN MORRISON, and STEVEN TSEFFOS, individually and on behalf of a class of all others similarly situated, | Case No. |
| Plaintiffs, | **COMPLAINT – CLASS ACTION** |
| v. | **JURY TRIAL DEMAND** |
| FERRELLGAS PARTNERS, L.P., a limited partnership; FERRELLGAS, L.P., a limited partnership, also doing business as BLUE RHINO; AMERIGAS PARTNERS, L.P., a limited partnership, also doing business as AMERIGAS CYLINDER EXCHANGE; and UGI CORPORATION, a corporation, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Mario Ortiz, Stephen Morrison, and Steven Tseffos, on behalf of themselves and all others similarly situated, allege as follows:

### I.      INTRODUCTION

1.      This action arises out of a conspiracy to fix fill levels of exchangeable portable cylinder tanks containing propane gas commonly referred to as "propane exchange tanks." The conspirators are the two leading distributers of such tanks:  Ferrellgas Partners, L.P and Ferrellgas, L.P. (doing business as Blue Rhino) and UGI Corporation and AmeriGas Partners, L.P. (doing business as AmeriGas Cylinder Exchange).

2.     Blue Rhino and AmeriGas distribute their propane exchange tanks through tens of thousands of retail partners across the United States, including grocery stores, convenience stores and gas stations.  Two of the largest retail partners are Walmart, Inc. ("Walmart") and Lowe's Home Improvement Warehouse ("Lowe's").

3.     Tens of thousands of consumers in the United States purchase Defendants' propane tanks to fuel barbeque grills and outdoor heaters.

4.     In the spring of 2008, Blue Rhino and AmeriGas took advantage of a spike in propane prices to raise their margins. Specifically, Blue Rhino decided to increase margins by reducing the amount of propane contained in its exchange tanks from 17 pounds to 15 pounds. Blue Rhino planned to reduce the fill level in its exchange tanks without a corresponding reduction in the wholesale price. This would have the effect of raising the price per pound of propane to consumers.

5.     During spring and summer 2008, Blue Rhino unlawfully informed its direct competitor AmeriGas that it intended to implement the fill reduction.  AmeriGas then likewise decided to reduce its exchange tanks from 17 pounds to 15 pounds without a corresponding price decrease.

6.     In summer 2008, Blue Rhino and AmeriGas each began to implement the fill reduction, but were met with stiff resistance from Walmart. Walmart refused to accept the fill reduction, pointing out that it was effectively a price increase. Because of Walmart's market power and ability to purchase from either Blue Rhino or AmeriGas, neither company could unilaterally implement the fill reduction without risking the loss of Walmart's business.

7.     Blue Rhino's customer Lowe's accepted the fill reduction only on the condition that all of Blue Rhino's other customers – including Walmart – also accept the fill reduction within a short period of time.

8.     Faced with resistance from Walmart, Blue Rhino and AmeriGas colluded by secretly and illegally agreeing to maintain a united front to push their joint customer, Walmart, to accept the fill reduction.

9.     This concerted action had the purpose and effect of raising the effective wholesale prices at which Blue Rhino and AmeriGas sold propane exchange tanks to Walmart, as well as to other customers in the United States.

10.    Defendants' conduct has restrained price competition and led to higher prices for sales of propane exchange tanks in the United States.  As a result of Defendants' conduct, consumers were and continue to be cheated out of hundreds of thousands if not millions of pounds of propane, and, therefore, effectively paid more than they otherwise would have for propane contained in propane exchange tanks.

## II.      JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4 and 15 and 28 U.S.C. §§ 1331 and 1337, in that this action arises under the federal antitrust laws.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

12.    This Court has personal jurisdiction over Defendants because they conduct sufficient business in this state to satisfy due process.  Defendants Ferrellgas Partners, L.P and Ferrellgas, L.P are headquartered in Kansas. Defendants AmeriGas Partners, L.P., and UGI

Corporation knowingly transacted business in Kansas through the unlawful agreements with Ferrellgas Partners, L.P and Ferrellgas, L.P. In addition, both Blue Rhino and AmeriGas brand propane tanks are sold and marketed to consumers in Kansas.

13.   Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Defendants conduct business in this judicial district, and because a substantial part of the acts or omissions giving rise to the claims set forth herein occurred in this judicial district.

### III.   PARTIES

**A.   Plaintiffs**

14.   Plaintiff Stephen Morrison is a resident of Frisco, Texas and a consumer of propane exchange tanks sold by Defendant Blue Rhino.

15.   Plaintiff Mario Ortiz is a resident of Phoenix, Arizona and a consumer of propane exchange tanks sold by Defendant AmeriGas.

16.   Plaintiff Steven Tseffos is a resident of Phoenix, Arizona and a consumer of propane exchange tanks sold by Defendants Blue Rhino and AmeriGas.

**B.   Defendants**

17.   Defendant Ferrellgas Partners, L.P., is a limited partnership organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its principal place of business located at 7500 College Boulevard, Overland Park, Kansas. It maintains a nearly complete interest in and conducts its business activities primarily through Defendant Ferrellgas, L.P.

18.   Defendant Ferrellgas, L.P., is a limited partnership organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its principal place of

business located at 7500 College Boulevard, Overland Park, Kansas.  Ferrellgas, L.P., doing business as Blue Rhino, operates a national propane distribution business, and owns or has access to distribution locations nationwide. Its business includes the filling, refilling, refurbishing, sale and distribution of propane exchange tanks under the Blue Rhino name.

19.   For the purposes of this complaint, "Blue Rhino" shall refer to Ferrellgas Partners, L.P., and Ferrellgas, L.P., collectively.

20.   Defendant AmeriGas Partners, L.P., is a publicly traded master limited partnership, organized, existing, and doing business, under, and by virtue of, the laws of the State of Delaware, with its office and principal place of business located at 460 North Gulph Road, King of Prussia, Pennsylvania.   AmeriGas Partners, L.P., operates a national propane distribution business through its subsidiary, AmeriGas Propane, L.P.

21.   Defendant AmeriGas Partners, L.P., through AmeriGas Propane, L.P., is engaged in the marketing and sale of propane and propane supply related services, including the distribution and supply of bulk propane to residential, commercial, and agricultural customers, and the preparing, filling, distributing, marketing, and sale of propane exchange tanks. AmeriGas Propane, L.P. often does business as AmeriGas Cylinder Exchange when preparing, filling, distributing, marketing, or selling propane exchange tanks.

22.   Defendant UGI Corporation is a corporation, organized, existing and doing business under and by virtue of the laws of the Commonwealth of Pennsylvania, with its office and principal place of business located at 460 North Gulph Road, King of Prussia, Pennsylvania. UGI Corporation is the parent and sole owner of AmeriGas Propane, Inc. AmeriGas Propane, Inc. is the general partner of Defendant AmeriGas Partners, L.P., and is a

corporation organized, existing, and doing business under and by virtue of the laws of the Commonwealth of Pennsylvania, with its office and principal place of business located at 460 North Gulph Road, King of Prussia, Pennsylvania.

23.   For the purposes of this complaint, "AmeriGas" shall refer to AmeriGas Partners, L.P., and UGI Corporation, collectively.

### IV.   RELEVANT MARKET

24.   The relevant market is the marketing and sale of propane exchange tanks.

25.   There are no widely used substitutes for propane exchange tanks that provide a similar ease of use. No other product significantly constrains the prices of propane exchange tanks.

26.   The relevant geographic market is the United States. To compete effectively for sales to national retailers, including Walmart, The Home Depot and Lowe's, propane exchange tank manufacturers need access to refilling and refurbishing facilities located throughout the United States. Propane exchange tank suppliers that lack nationwide access to such assets are unable to constrain the prices of propane exchange tanks.

27.   At all times relevant to this complaint, Blue Rhino and AmeriGas were the two largest suppliers of propane exchange tanks in the United States.   Blue Rhino controlled approximately 50 percent of the United States wholesale propane exchange tank market; AmeriGas controlled approximately 30 percent of the market. No other competitor served more than nine percent of the market. No other competitor was capable of servicing large national retailers such as Walmart and Lowe's, except on a limited basis.

28.   Beginning in or about 2006, Defendants entered into a series of "co-packing agreements."   Pursuant to these agreements, each company agreed to refurbish and refill

propane exchange tanks for the other company at certain of each company's facilities. Today, each Defendant processes slightly less than ten percent of the other company's used, empty tanks pursuant to co-packing agreements. Blue Rhino refurbishes and refills exchange tanks for AmeriGas at Blue Rhino facilities in Florida, Colorado, Washington and Missouri. AmeriGas refurbishes and refills exchange tanks for Blue Rhino at AmeriGas facilities in California and New Hampshire.

29.   These co-packing agreements impose significant costs on consumers by facilitating the exchange of pricing information between two direct competitors.   The benefits of the agreements are minimal and outweighed by the anticompetitive effects.

30.   Industry practice is to implement fill reductions at the same time in all retail channels. This is because of the administrative difficulties of maintaining different fill levels at different retailers and because Defendants' customers will not accept lesser fill levels than their competitors, going so far as to insert clauses into their contracts guaranteeing that their fill level will be the same as their competitors. Therefore, the failure of a large customer, such as Walmart, to accept a proposed fill reduction effectively prevents implementation of the reduced fill level at other retailers.

## V.   OVERVIEW OF THE MARKET

31.   Propane is a clean burning, colorless gas. Propane exchange tanks are commonly used to operate gas grills, patio heaters, outdoor fireplaces and mosquito traps.

32.   Propane exchange tanks have a maximum capacity of 25 pounds, but pre-2002 safety regulations limited the filling of such tanks to 80 percent of their capacity, *i.e.*, 20 pounds. Beginning in 2002, the National Fire Protection Association modified its standards to require that propane exchange tanks be equipped with an overfilling protection device

("OPD").  Defendants' adoption of the OPD standard necessitated a further reduction in fill levels to approximately 17.5 pounds of propane.

33.   Propane exchange tanks sold in the United States are highly standardized products consisting of a standardized tank and a standardized valve system.  Propane and propane exchange tanks are homogeneous products.

34.   Propane exchange tanks are typically sold to consumers through home improvement stores, hardware stores, mass merchandisers, supermarkets, convenience stores and gas stations.  Retailers who sell propane exchange tanks usually offer consumers the option of purchasing a prefilled tank in exchange for an empty tank, or, for a higher price, a prefilled tank without returning an empty tank.

35.   Propane exchange tanks sold in the United States are functionally interchangeable, and Defendants, their competitors and the retailers who sell them treat them as such. Consumers can exchange any propane exchange tank at any store that carries propane exchange tanks without regard for which company supplied the tank to be exchanged.

36.   To serve retail outlets that sell propane exchange tanks, Defendants and their competitors need access to refurbishing and refilling facilities, where empty tanks can be cleaned, refurbished, repainted and refilled.  As discussed above, pursuant to co-packing agreements, Defendants may refurbish and refill each other's tanks at some facilities.

## VI.    ANTICOMPETITIVE CONDUCT

37.   In early 2008, Defendants faced a spike in propane exchange tank input costs, including the price of propane.

38.   In or about January 2008, Respondent AmeriGas considered a plan to recoup its rising input costs by reducing the fill level in its propane exchange tanks.  AmeriGas decided

not to pursue the fill reduction plan because, among other reasons, AmeriGas believed it could be competitively disadvantaged if other companies in the industry did not follow AmeriGas's lead by also reducing the fill level in their propane exchange tanks.

39.   In April 2008, Blue Rhino management approved a proposal to reduce the fill level in the company's propane exchange tanks from the then-standard 17 pounds to 15 pounds, without a corresponding price reduction, to offset the increased input costs.  The Blue Rhino proposal included a plan to inform AmeriGas in advance of the proposed fill reduction.

40.   Blue Rhino understood that unilaterally reducing the fill level in its exchange tanks risked putting the company at a competitive disadvantage if its principal competitor, AmeriGas, did not also reduce fill levels. Blue Rhino was particularly concerned about its competitive standing with its second largest customer, Walmart, because Walmart purchased tanks from both Blue Rhino and AmeriGas.

41.   Walmart is the largest propane exchange tank retailer in the United States.  Blue Rhino services approximately 60 percent of the Walmart locations nationwide, while AmeriGas services approximately 35 percent.  Ozark Mountain Propane Company ("Ozark'), a smaller regional propane supplier, services the remaining Walmart locations.

42.   The Blue Rhino Director of Strategic Accounts responsible for Walmart reported to his manager that the fill reduction could put Blue Rhino at a competitive disadvantage to AmeriGas.  He stated:  "[I]n my mind the 'watch out' is the competitive difference between [Blue Rhino, AmeriGas] and Ozark.  We are offering less product vs. [Walmart's] other 2 suppliers. . . . Once we explain this is a done deal (and that we are not asking for [Walmart's] input or letting him decide), he may become resentful and threaten to take states. . . . Then, we

need to pray that [AmeriGas] takes a similar move as soon as possible.  If [AmeriGas] doesn't move, we will have a BIG issue."  He elaborated:  "The only thing that can make this go away is if AmeriGas goes to 15 as well, but it has to happen very soon after us to legitimize our move."

43.   On or about April 22, 2008, Blue Rhino decided to inform Walmart of its fill reduction plan.

44.   On or about April 28, 2008, Blue Rhino's Director of Strategic Accounts met with the Walmart buyer and announced Blue Rhino's intention to reduce the fill in its propane exchange tanks.  Walmart rejected the proposed fill reduction.  Walmart's buyer told the Blue Rhino Director of Strategic Accounts that the fill reduction was a price increase to which Walmart would not agree.  He also told Blue Rhino's Director of Strategic Accounts that Walmart did not want to carry propane exchange tanks with different fill levels—that is, tanks at 15 pounds in stores serviced by Blue Rhino and tanks at 17 pounds in stores serviced by AmeriGas and Ozark.

45.   On or about April 29, 2008, a senior Blue Rhino manager ordered production managers to "stand down" on implementation of the fill reduction because "[t]he call with WalMart did not go according to plan."

46.   Starting with Blue Rhino's communication plan in April 2008, which revealed Blue Rhino's intention to let AmeriGas know "well in advance" about the fill reduction, and continuing through a series of communications through June 2008, Blue Rhino informed AmeriGas of its plan to raise prices by reducing the fill level in Blue Rhino's exchange tanks from 17 to 15 pounds without a corresponding price decrease.

47.   On or about May 23, 2008, Blue Rhino's Vice President of Operations, Jay Werner met with AmeriGas's vice president responsible for the propane exchange tank business. The meeting was allegedly to discuss additional opportunities to refurbish, wash, and fill each other's tanks; however, the executives toured each other's facilities and discussed the fixed costs of the facilities.  At the end of the meeting, Werner brought up the idea of reducing the propane in Blue Rhino's tanks from 17 to 15 lbs.

48.   At the same meeting, Werner and AmeriGas's vice president discussed Werner's communications with Kosan Crisplant, a distributor and operator of propane filling equipment. Kosan Crisplant could build and operate propane wash and fill facilities. Werner told Kosan Crisplant that if it built a plant in the Northeast United States, it could wash and fill tanks for Blue Rhino and AmeriGas. However, Blue Rhino and AmeriGas would not allow Kosan Crisplant to wash and fill tanks for Heritage Propane, a small but aggressive competitor of Blue Rhino and AmeriGas.

49.   On May 29, 2008, Blue Rhino proposed the fill reduction to Lowe's, Blue Rhino's largest retail customer.  Approximately two weeks later, Lowe's agreed to accept 15-pound exchange tanks on the condition that Blue Rhino convert all of its customers, including Walmart, to 15-pound tanks within 30 days.

50.   On June 18, 2008, Blue Rhino's President telephoned AmeriGas's Director of National Accounts. The two men called each other six more times over the next 30 hours.  The following day, Blue Rhino account executives again discussed the fill reduction with Walmart. Following the last of these calls, Blue Rhino's President reported, "I've continued to have a lot of inquiries from [AmeriGas] regarding the lower fuel fill due to their need to adjust

production. I've been told that it would be very challenging to produce two different size products long-term. . . once again, messaging that they'll follow closely behind us in the market."

51.   On June 20, 2008, AmeriGas management produced a draft budget with a plan for reducing the fill level of AmeriGas's exchange tanks from 17 to 15 pounds.

52.   On or about June 25, 2008, Todd Brown, President of Blue Rhino and Senior Vice President of Sales and Marketing for Ferrellgas, Inc. called AmeriGas's president of sales and marketing to discuss the fill reduction again. Also on June 25, 2008, Blue Rhino began notifying its customers of its plans to reduce the fill level in its propane exchange tanks effective July 21, 2008.

53.   As alleged above, AmeriGas considered and rejected a plan to unilaterally reduce the fill level in its propane exchange tanks.  AmeriGas believed it could be competitively disadvantaged if other companies in the industry did not also reduce the fill level in their propane exchange tanks.  After learning that Blue Rhino planned to reduce the fill level of its exchange tanks, AmeriGas reconsidered its earlier decision.

54.   On or about June 26, 2008, Jay Werner of Blue Rhino and an AmeriGas employee discussed operational changes needed for the fill reduction. Representatives from the two companies also discussed the timing of the first distribution of under-filled propane exchange tanks to their customers.

55.   By the last week of June 2008, Blue Rhino and AmeriGas agreed on the fill reduction. Blue Rhino would begin selling tanks 15 pounds of propane on July 21, 2008. AmeriGas would do the same on August 1, 2008.

56.   AmeriGas described the change in the propane tank exchange program to its employees by a memorandum dated July 15, 2008:  "In an attempt to offset some of these expenses, achieve desired product margins, and maintain retail prices at an attractive level for consumers, AmeriGas Cylinder Exchange *and other national providers* are transitioning to a 15 pound cylinder.  This slight decrease from current 17 pound levels *will quickly become the industry standard . . . .*"  (Emphasis added.)

57.   In announcing the change to its production team, AmeriGas stated:  "The cylinders will be filled with 3.5 gallons of propane versus the current 4 gallons. . . .  *The major competitors in cylinder exchange will also be moving to a 15 pound cylinder* and as a result, it will become the industry standard."  (Emphasis added.)  The "other national providers" and "major competitors" in the propane exchange industry referred to by AmeriGas include primarily, if not solely, Blue Rhino.

58.   Blue Rhino was concerned that, if Walmart rejected the fill reduction, other major retailers would also reject the fill reduction on the ground that they would be at a competitive disadvantage if the propane exchange tanks they sold contained less fuel than otherwise identical exchange tanks sold at Walmart.

59.   In particular, Lowe's, Blue Rhino's largest customer, agreed to accept the fill reduction only on the express condition that all Blue Rhino customers would also convert to 15- pound tanks within 30 days of Lowe's converting to 15-pound tanks.

60.   For one or all of the reasons set forth above, Blue Rhino and AmeriGas understood they could not sustain the fill reduction unless it was accepted by Walmart.  Therefore, when faced with resistance from Walmart, the two companies agreed that neither would deviate

from their proposal to Walmart.  They worked together to take the steps necessary to push Walmart to promptly accept the fill reduction.

61.   AmeriGas announced the existence of a united front with Blue Rhino by couching its fill reduction plan as an "industry standard."  For example, on July 10, 2008, AmeriGas's Director of National Accounts emailed Walmart's buyer to inform him that "the cylinder exchange industry is planning a move to a standard weight of propane in a tank from 17 lbs. net to 15 lbs. net."

62.   On or about July 10, 2008, and continuing for three months thereafter, sales executives from the two Defendants communicated repeatedly by telephone and email to apprise each other of the status of their discussions with Walmart and to encourage each other to hold firm to convince Walmart to accept the reduction in fill.

63.   On or about July 11, 2008, Blue Rhino's Vice President of Sales called AmeriGas's Director of National Accounts.  The two sales executives spoke at length by telephone. Internal Blue Rhino documents confirm that AmeriGas and Blue Rhino sales executives discussed Walmart's rejection of AmeriGas's proposal to begin shipping 15-pound exchange tanks.

64.   On or about July 21 and 22, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts spoke at length by telephone. Blue Rhino internal documents confirm that the AmeriGas and Blue Rhino sales executives discussed AmeriGas's plans for responding to Walmart's rejection of the fill reduction.

65.   On or about August 11, 2008, the AmeriGas Director of National Accounts, who was responsible for dealing with Walmart, called Blue Rhino's Vice President of Sales and

told him that he was having trouble getting in touch with Walmart to discuss the reduction in fill levels.

66.   On or about August 13, 2008, the Blue Rhino sales executives responsible for dealing with Walmart discussed plans for advising AmeriGas of the need to ensure that The Home Depot, AmeriGas's largest retail customer, was supplied with 15-pound, not 17-pound, tanks, because Walmart would be more likely to accept the fill reduction if it knew that The Home Depot had already accepted it.

67.   On August 21, 2008, the Blue Rhino and AmeriGas sales executives spoke several times by telephone, and shortly after these communications, the AmeriGas sales executive and AmeriGas's operations manager directed their colleagues to ensure that The Home Depot store in Rogers, Arkansas (near Walmart's Bentonville headquarters) carried only 15-pound tanks.

68.   On September 2, 2008, Blue Rhino's Vice President of Sales and AmeriGas Director of National Accounts spoke by telephone again.  They discussed the status of their respective efforts to convert their customers to 15-pound tanks, as well as the current retail pricing of tanks at Lowe's.

69.   On September 12, 2008, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts spoke by telephone again. They discussed the status of their negotiations with Walmart.  Expressing frustration at Walmart's intransigence, AmeriGas's Director of National Accounts suggested that it was time to issue an ultimatum to Walmart. Blue Rhino's Vice President of Sales responded by telling him that Blue Rhino was continuing to work with Walmart and that AmeriGas should "hang in there."

70.  On September 15 and 22, 2008, Blue Rhino's Vice President of Sales and AmeriGas' Director of National Accounts spoke again by telephone.

71.  On September 30, 2008, the AmeriGas Director of National Accounts emailed Blue Rhino's Vice President of Sales and informed him that Walmart management was meeting the following day to discuss the proposed fill reduction.

72.  On October 6, 2008, the Lowe's buyer emailed his Blue Rhino sales executive with an ultimatum.  Lowe's had agreed to accept 15-pound tanks on the condition that all other Blue Rhino customers would be converted within 30 days.  Lowe's observed that Walmart was still selling 17-pound tanks and that Lowe's was therefore at a competitive disadvantage.  The Lowe's buyer demanded that either all of Blue Rhino's customers must be at 15 pounds or Lowe's be converted back to 17-pound tanks at the same price it was paying for the 15-pound tanks.

73.  The Lowe's demand confirmed to Blue Rhino that it needed Walmart to accept the fill reduction or risk the fill reduction unraveling.  It also highlighted the need for Blue Rhino and AmeriGas to continue to push Walmart to accept the fill reduction.

74.  On October 6, 2008, Blue Rhino's President forwarded the Lowe's email to his Vice President of Sales and directed him to finalize Walmart's acceptance of the fill reduction that day.  Within a half hour, the Blue Rhino Vice President of Sales called his counterpart at AmeriGas.  The two talked for 16 minutes.

75.  Following his 16-minute conversation with the AmeriGas Director of National Accounts, the Blue Rhino Vice President of Sales emailed Walmart to demand that it accept the fill reduction.

76.   Early the following morning, the AmeriGas Director of National Accounts, using language similar to Blue Rhino's communication, emailed Walmart urging it to implement the fill reduction.

77.   On October 10, 2008, believing it had no alternative to the fill reduction, Walmart agreed to accept propane exchange tanks filled to 15 pounds from both Blue Rhino and AmeriGas.

78.   The secret agreement between Blue Rhino and AmeriGas that neither would deviate from their proposal to Walmart when faced with resistance from Walmart, and their combined efforts to push Walmart to promptly accept the fill reduction had the effect of raising the price per pound of propane to Walmart and to the ultimate consumers.

79.   The acts and practices of Defendants, as alleged herein, have the purpose, capacity, tendency, and effect of restricting or eliminating competition in the sale of propane exchange tanks.  Absent their unlawful agreement, Defendants would not have been able to reduce the fill levels of their tanks to 15 pounds.

80.   There are no legitimate, procompetitive efficiencies that justify the conduct of Defendants, as alleged herein, or that outweigh its anticompetitive effects.

81.   Defendants' conspiracy is a continuing conspiracy.   Both defendants have continued to maintain the reduced fill levels despite the fact that propane prices have decreased substantially from their 2008 high.

## VII.   INJURY TO PLAINTIFFS AND CLASS MEMBERS

82.   As described herein, as a result of Defendants' conspiracy, Plaintiffs and other class members were deprived of approximately two pounds of propane in each tank they purchased, which they would have received in a competitive market.

83.   As described herein, as a result of Defendants' conspiracy, Plaintiffs and class members paid more and continue to pay more for propane than they would have paid in a competitive market.

**A.     Stephen Morrison**

84.   In approximately June 2013, Plaintiff Stephen Morrison purchased a pre-filled Blue Rhino propane exchange tank from Walmart in Frisco, Texas. About two months later, Plaintiff Morrison exchanged his propane tank for another Blue Rhino tank and purchased an additional Blue Rhino tank at Kroger in Frisco, Texas.

**B.     Mario Ortiz**

85.   Plaintiff Mario Ortiz has purchased AmeriGas propane exchange tanks from Walmart and Ace Hardware in Glendale and Phoenix Arizona.

86.   During the class period, Plaintiff Ortiz purchased approximately seven to nine propane exchange tanks.

87.   Plaintiff Ortiz's most recent purchase of an AmeriGas propane exchange tank was in May 2014.

**C.     Steven Tseffos**

88.   Plaintiff Steven Tseffos has purchased AmeriGas and Blue Rhino propane exchange tanks from Walmart, Ace Hardware and Shell in Tempe, Arizona.

89.   During the class period, Plaintiff Tseffos has purchased approximately six propane exchange tanks.

## VIII.   CLASS ACTION ALLEGATIONS

90.   Plaintiffs sue on their own behalf and pursuant to Federal Rule of Civil Procedure 23(b)(3) and (b)(2) on behalf of the following nationwide class of persons ("Nationwide Class"):

> All persons who, in the United States, purchased a filled propane exchange tank or paid to exchange their already-purchased propane exchange tank, and whose tank was provided by AmeriGas between December 1, 2009, and the date judgment is entered in this case, or by Blue Rhino between October 14, 2011, and the date judgment is entered in this case.

91.   Plaintiffs Ortiz and Tseffos also sue on their own behalf and pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of the following multi-state subclass (Multi-State Subclass) defined as follows:

> All persons who, in the *Illinois Brick* Repealer States, purchased a filled propane exchange tank or paid to exchange their already-purchased propane exchange tank, and whose tank was provided by AmeriGas between December 1, 2009, and the date judgment is entered in this case, or by Blue Rhino between October 14, 2011, and the date judgment is entered in this case.

92.   *Illinois Brick* Repealer States are Arizona, California, District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi,[1] Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

93.  Excluded from the proposed Nationwide Class and Multi-State Subclass (collectively "the Class") are Defendants, any entity in which Defendants have a controlling interest, Defendants' legal representatives, predecessors, successors, assigns, and employees,

---

[1] Statute permits indirect claims, and it pre-dated *Illinois Brick.  See Crown Oil Corp. v Sup. Ct.*, 177 Cal. App. 3d 604, 609 n. 3 (Cal. Ct. App. 1986).

counsel for plaintiffs (and their employees) and any Judge to whom this case is or may be assigned, his or her court staff, as well as his or her immediate family.

94.   Each Plaintiff is a member of the Class he seeks to represent. Members of the Class can be identified using Defendants' records or the records of retailers. Class members can be notified of the class action through publication, direct mailings and posted notices at propane tank retailers. Plaintiffs reserve the right to modify the class definitions based upon discovery.

95.   The persons in each class are so numerous that individual joinder of all members is impracticable.  Although the precise number of such persons is unknown to Plaintiffs, given the nationwide scope of Defendants' business, the number of class members clearly exceeds the number that would make joinder possible.

96.   There are common questions of law and fact specific to the each class that predominate over any questions affecting individual members, including:

(a) Whether Blue Rhino and AmeriGas unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act and applicable state laws by reducing the fill level in propane exchange tanks from the then-standard 17 pounds to 15 pounds, without a corresponding price reduction, to offset the increased input costs.

(b) Whether Blue Rhino and AmeriGas unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act and applicable state laws by agreeing that neither would deviate from their proposal to reduce the fill level to Walmart;

(c) Whether Blue Rhino and AmeriGas unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act and applicable state laws by pushing Walmart to promptly accept the fill reduction;

(d) Whether Blue Rhino and AmeriGas have exchange competitively sensitive information in violation of section 1 of the Sherman Act and applicable state laws;

(e) The definition of the relevant market;

(f) Whether Defendants have any pro-competitive justification for their conduct;

(g) Whether the pro-competitive effects of the conduct, if any, outweigh the clear injury to class members;

(h) Whether class members have suffered antitrust injury, and if so, to what relief they are entitled; and

(i) The nature and scope of injunctive relief necessary to restore a competitive market, including whether equity requires Defendants to disgorge their ill-gotten profits.

97.   Plaintiffs' claims are typical of the claims of other class members as they arise out of the same course of conduct and the same legal theories as the rest of the Class, and Plaintiff challenges the practices and course of conduct engaged in by Defendants with respect to the Class as a whole.

98.   Plaintiffs will fairly and adequately protect the interests of the Class. Each Plaintiff will vigorously pursue the claims and has no antagonistic conflicts.  Plaintiffs have retained counsel who are able and experienced class action litigators.

99.   Defendants have acted or refused to act on grounds that apply generally to the Class, and final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.  A class action is also appropriate because Defendants have acted and refused to take steps that are, upon information and belief, generally applicable to thousands of individuals, thereby making injunctive relief appropriate with respect to the Class as a whole.

100. Questions of law or fact common to class members predominate over any questions affecting only individual members.  Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation no individual class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendants. Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of class members to pursue their claims.  It is not anticipated that there would be difficulties in managing this case as a class action.

## IX.   TOLLING OF STATUTE OF LIMITATIONS

**A.    Defendants Conceal Their Fill Reduction.**

101. As described above, in 2008 a propane exchange tank containing approximately 17-18 pounds of propane was considered full.

102. Blue Rhino's website confirmed that an ordinary 20 pound tank held "about 17 pounds of fuel" when full.

103. Unlike many other products, a visual inspection of a 20 pound propane exchange tank does not reveal whether the tank contains 17-18 pounds of fuel.

104. When Defendants instituted the fill reduction, they did not reduce the size of their propane exchange tanks or otherwise disclose the fill reduction to consumers.

105. In fact, after the reduction, signs, banners, and other advertising materials provided by Defendants to retailers continued to state that customers would receive a "full" tank even though customers actually received partially filled tanks.

106. For example, on the locked cages that held AmeriGas's propane exchange tanks, a sign read "No Wait, No Worry Exchange Tank. Happiness is a Full Tank."

107. On Blue Rhino's display cages, it offered "A Better Way" for exchanging an empty propane exchange tank for a full cylinder from the "#1 BRAND IN TANK EXCHANGE." Also, Blue Rhino noted to customers that they could exchange, replace or buy another tank through quick statements implying that the tanks they were purchasing were filled to safe capacity: "Exchange Empty for Full," "Upgrade Your Obsolete Cylinder" and "Don't Run Out - Buy A Spare."

**B.      Initial Private Lawsuits.**

108. Beginning in June 2009, consumers filed numerous actions against Defendants related to the fill reduction.

109. The complaints alleged, *inter alia*, that AmeriGas and Blue Rhino engaged in unfair and deceptive practices when they concealed the fill reduction from consumers, continued to advertise the propane exchange tanks as "full" and sold propane exchange tanks at the same price.

110. On August 6, 2009, plaintiffs in *Downs v. Ferrellgas Partners, L.P., et al*, No. 09-cv-2412 (D. Kan.) alleged on behalf of a putative nationwide class that AmeriGas and Blue Rhino violated state antitrust law by conspiring to under-fill propane exchange tanks and thereby effectuating a price increase.

111. The United States Judicial Panel on Multidistrict Litigation transferred the *Downs* action and several other actions to the Western District of Missouri for pretrial consolidation and coordination.

112. On November 2, 2009, the parties announced that a settlement had been reached with AmeriGas.

113. On October 6, 2010, the court granted final approval of the class action settlement with AmeriGas.

114. The settlement defined the class as "All people who purchased or exchanged one or more of AmeriGas' pre-filled propane gas cylinders in the United States not for resale, between June 15, 2005, and November 30, 2009."

115. On November 12, 2010, objectors filed notice of appeal to the United States Court of Appeals for the Eighth Circuit.

116. The appeal was dismissed on February 22, 2011 and the mandate was issued on May 9, 2011.

117. While the settlement with AmeriGas was progressing, on February 22, 2010, the plaintiffs filed a consolidated complaint against Blue Rhino. In the consolidated complaint, the plaintiffs sought declaratory and injunctive relief under § 1 of the Sherman Act and damages for violations of state antitrust laws.

118. The action against Blue Rhino also settled. The court granted final approval of the settlement on May 31, 2012.

119. The settlement defined the class as "All people who purchased or exchanged one (1) or more of Ferrellgas's pre-filled propane gas cylinders in the United States, not for resale, between June 15, 2005, and October 13, 2011."

120. On June 22 and 28, 2012, objectors filed notice of appeal to the United States Court of Appeals for the Eighth Circuit.

121. The appeals were dismissed on November 23, 2012 and the mandate was issued November 27, 2012.

122. As a result of the private actions described above, any applicable statute of limitations was tolled with respect to claims against AmeriGas for the period of August 6, 2009 to May 9, 2011 and with respect to claims against Blue Rhino for the period of August 6, 2009 to November 27, 2012.

C.      **Federal Trade Commission Action**

123. On March 27, 2014, the Federal Trade Commission (FTC) filed an administrative action against Defendants.

124. The FTC action is based on the anticompetitive conduct outlined in this Complaint.

125. As a result of the filing of the FTC complaint, pursuant to 15 U.S.C. § 15, the statute of limitations for Plaintiffs' Sherman Act claim has been suspended and will remain suspended for a period of one year following the termination of that proceeding.

## X.   CAUSES OF ACTION

### COUNT I
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### (Equitable Relief Only—On Behalf Of Nationwide Class)

126. Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

127. Blue Rhino and AmeriGas, by and through their officers, directors, employees, agents or other representatives have entered into an unlawful agreement combination and conspiracy in restraint of trade.  15 U.S.C. § 1.  Specifically, Blue Rhino and AmeriGas have unlawfully agreed to reduce the fill levels of their tanks, thereby effectively raising the price charged for propane in those tanks.

128. Class members have been deprived of the benefits of free and open price competition.

129. Defendants have undertaken this conduct in the United States and its territories.

130. Defendants' business activities and operations involve and affect the interstate movement of propane exchange tanks.

131. As a direct result of the conduct of Defendants and its co-conspirators class members have been injured.  Price competition for the wholesale sale of propane exchange tanks has been unreasonably restrained and as a result class members have been injured because they are paying more for the propane in propane exchange tanks.

132. The conduct of Defendants is continuing and will continue to impose antitrust injury on class members unless equitable relief is granted.

133. The equitable relief outlined below is necessary to deter future antitrust violations, redress Plaintiffs' and class members' injuries, and restore competition to the propane market.

## COUNT II
## VIOLATION OF KANSAS ANTITRUST LAW
### (On Behalf of Nationwide Class)

134. Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

135. The conduct of Defendants alleged herein violates Kan. Stat. Ann. § 50-112, as the conspiracy described constitutes an arrangement, contract, agreement, trust, or combination between Defendants made with a view or which tends to prevent full and free competition in the sale of propane exchange tanks, and which was designed or which tended to advance or control the price of propane exchange tanks.

136. As alleged herein, class members have been injured in their businesses and property as a result of Defendants' violation of Kan. Stat. Ann. § 50-112, for which they seek damages pursuant to Kan. Stat. Ann. § 50-161. As a proximate result of Defendants' conduct, Plaintiff and class members have been damaged in an amount to be proven at trial.

## COUNT III
## VIOLATION OF STATE ANTITRUST LAWS
### (On Behalf of Multi-State Subclass)

137. Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

138. The combination and conspiracy alleged herein has had the following effects, among others:

    (a) Price competition in the sale of propane exchange tanks has been restrained or suppressed throughout each State set forth below;

(b) Prices for propane exchange tanks sold by Defendants have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout each State set forth below;

(c) Those who purchased propane exchange tanks in each State set forth below, directly or indirectly, from Defendants have been deprived of the benefits of free and open competition;

(d) Purchasers in each State set forth below paid supra-competitive, artificially inflated prices for propane exchange tanks.

139. During the class period, Defendants' illegal conduct substantially affected commerce in each State set forth below.

140. As a direct and proximate result of Defendants' unlawful conduct, the members of the Multi-state Subclass have been injured in their business and property in that they have paid more for the propane in propane exchange tanks, and are threatened with further injury.

141. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of the laws of each State set forth below.

142. **Arizona**:  The aforementioned conduct by Defendants was and is in violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401 *et seq*.

143. **California**:  The aforementioned conduct by Defendants was and is in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq*.

144. **District of Columbia**:  The aforementioned conduct by Defendants was and is in violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501 *et seq*.

145. **Florida**:  The aforementioned conduct by Defendants was and is in violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*

146. **Iowa**:  The aforementioned conduct by Defendants was and is in violation of the Iowa Competition Law, Iowa Code §§ 553.1 *et seq.*

147. **Kansas**:  The aforementioned conduct by Defendants was and is in violation of the Kansas Restraint of Trade Act, K.S.A. §§ 50-101 *et seq.*

148. **Maine**:  The aforementioned conduct by Defendants was and is in violation of the Maine Monopolies and Profiteering Statute, Maine Rev. Stat. Ann. tit. 10 §§ 1101 *et seq.*

149. **Michigan**:  The aforementioned conduct by Defendants was and is in violation of the Michigan Antitrust Reform Act, Michigan Comp. Law Ann. §§ 445.771 *et seq.*

150. **Minnesota**:  The aforementioned conduct by Defendants was and is in violation of the Minnesota Antitrust Law of 1971, Minnesota Stat. §§ 325D.49 *et seq.*

151. **Mississippi**:  The aforementioned conduct by Defendants was and is in violation of Mississippi Code Ann. §§ 75-21-1 *et seq.*

152. **Nebraska**:  The aforementioned conduct by Defendants was and is in violation of the Junkin Act, Neb. Rev. Stat. §§ 59-801 *et seq.*

153. **Nevada**:  The aforementioned conduct by Defendants was and is in violation of the Nevada Unfair Trade Practices Act, Nevada Rev. Stat. Ann. §§ 598A.010 *et seq.*

154. **New Mexico**:  The aforementioned conduct by Defendants was and is in violation of the New Mexico Antitrust Act, New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

155. **New York**:  The aforementioned conduct by Defendants was and is in violation of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340 *et seq.*

156. **North Carolina**:   The aforementioned conduct by Defendants was and is in violation of North Carolina Gen. Stat. §§ 75-1 *et seq*.

157. **North Dakota**:  The aforementioned conduct by Defendants was and is in violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01 *et seq*.

158. **South Dakota**:  The aforementioned conduct by Defendants was and is in violation of South Dakota Codified Laws Ann. §§ 37-1-3.1 *et seq*.

159. **Tennessee**:  The aforementioned conduct by Defendants was and is in violation of Tennessee Code Ann. §§ 47-25-101 *et seq*.

160. **Utah**:  The aforementioned conduct by Defendants was and is in violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101 *et seq*.

161. **Vermont**:  The aforementioned conduct by Defendants was and is in violation of Vermont Stat. Ann. tit. 9 §§ 2451 *et seq*.

162. **West Virginia**:   The aforementioned conduct by Defendants was and is in violation of the West Virginia Antitrust Act, West Virginia Stat. §§ 47-18-1 *et seq*.

163. **Wisconsin**:  The aforementioned conduct by Defendants was and is in violation of Wisconsin Stat. §§ 133.01 *et seq*.

## PRAYER FOR RELIEF

164. WHEREFORE, Plaintiffs, on behalf of themselves and the Nationwide Class and the Multi-State Subclass, as applicable, request that the Court enter an order or judgment against Defendants including the following:

(a) Certification of the action as a Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiffs as the Class Representatives and their counsel of record as Class Counsel;

(b) Compensatory damages on behalf of Plaintiffs and the Class in an amount to be proven at trial;

(c) Treble damages as permitted by law;

(d) Pre-judgment and post-judgment interest as provided for by law or allowed in equity;

(e) An injunction requiring Defendants to disgorge the entirety of any profits resulting from their unlawful conduct and establishing a plan for their equitable distribution or, in the alternative, an injunction requiring Defendant to provide class members with propane in an amount equal to the unlawful fill reductions;

(f) An injunction requiring Defendants to increase their fill levels to the level in existence prior to the anticompetitive conduct;

(g) An injunction voiding any existing co-packing agreements, prohibiting new co-packing agreements and prohibiting defendants from sharing pricing information or information regarding tank fill levels;

(h) The costs of bringing this suit, including reasonable attorneys' fees and costs; and

(i) All other relief to which Plaintiffs and the Class may be entitled at law or in equity.

## JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

165. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury on all issues so triable.  Pursuant to Local Rule 40.2, Plaintiffs hereby designate Kansas City, Kansas as the place of trial in this action.

DATED: May 30, 2014

**STUEVE SIEGEL HANSON LLP**

By   /s/ Norman E. Siegel
Norman E. Siegel, D. #70354
Barrett J. Vahle, D. #78300
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Phone:  816.714.7100
Facsimile:  816.714.7101
E-mail: siegel@stuevesiegel.com
            vahle@stuevesiegel.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
E-mail:  steve@hbsslaw.com

Robert B. Carey
Leonard W. Aragon
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email:  rob@hbsslaw.com
            leonard@hbsslaw.com

**THE PAYNTER LAW FIRM PLLC**

Stuart M. Paynter
1200 G Street N.W., Suite 800
Washington, DC  20005
Tel.:  (202) 626-4486
Fax:  (866) 734-0622
Email:  stuart@paynterlawfirm.com